UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Gail M. Wojcik,

                       Plaintiff,

                                                          **Report and Recommendation**

                v.                                                         15-CV-641A

Carolyn W. Colvin, Acting Commissioner
  of the Social Security Administration,

                       Defendant.
_____

I.       INTRODUCTION

       The Hon. Richard J. Arcara referred this case to this Court under 28 U.S.C. § 636(b). Pending before the Court are cross-motions for judgment on the pleadings by plaintiff Gail Wojcik ("Wojcik") (Dkt. No. 9) and the Commissioner of Social Security ("Commissioner") (Dkt. No. 15). Both sides agree that Wojcik had proper insured status between July 25, 2004, the date of her accident, and September 30, 2005, her date last insured. The major question in this case is whether Wojcik has a disability onset date that falls within the July 2004–September 2005 timeframe. The Commissioner says no—Wojcik's injuries from her fall did not render her disabled at any time, and nearly all of her medical evidence is dated 2006 and later. Wojcik disagrees, arguing that she meets the criteria for a medical listing covering her neck injuries and that her medical records relate back to her date of injury.

The Court has deemed the motion submitted on papers under Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons below, the Court respectfully recommends granting Wojcik's motion in part, to vacate the Commissioner's final determination and to require a repeated analysis of Steps Four and Five. The Court recommends denying Wojcik's motion in all other respects. The Court also recommends denying the Commissioner's motion.

## II.  BACKGROUND

### A.  *Procedural History*

Wojcik applied for Title II Disability Insurance Benefits on March 1, 2012, claiming a disability that began on July 25, 2004. (Certified Administrative Record at 88, hereinafter designated as [88].) Wojcik was 54 years old at the time of her application. [141.] In her application, Wojcik has employment and Social Security withholding information for the late 1990s, 2001, and 2010. [149–152.] The Commissioner initially denied Wojcik's claim on October 22, 2012. [88.] On November 15, 2012, Wojcik requested a hearing before an Administrative Law Judge ("ALJ"). [102.] Wojcik sought a hearing because, in her view, her impairments met or equaled Listing 1.04(A) of the Commissioner's Listing of Impairments. [102.]

Wojcik's hearing occurred on December 23, 2013 before ALJ Donald McDougall. Wojcik testified that she became disabled on July 25, 2004 because of an injury that she suffered in front of her house. [30.] A utility company apparently had torn up some part of the sidewalk in front of Wojcik's house to dig for utility access. [30.] The utility company did not use any plywood to cover the hole that was dug, and Wojcik's foot wound up stepping and falling into the hole. [30.] The way in which Wojcik fell into the hole was such that she went to the hospital for ankle surgery

[195] and to have her left arm placed in a cast and her right arm placed in a splint. [30.] Wojcik testified that sometime after the accident, she started developing numbness between her left fingers and her left elbow. [31–32.] Wojcik subsequently testified that the numbness traced back to problems with her neck and that she was taking medication to manage the pain. [33–36.] Wojcik also mentioned her psoriasis and how it made walking difficult. [38–39.] The ALJ, however, pointed out that Wojcik had no records in the claim file that addressed psoriasis. [59.] The ALJ gave Wojcik an opportunity to obtain treatment records for the psoriasis. [60.] With respect to household activities, Wojcik testified that she could not lift laundry in and out of the washer and dryer [46] but could do dusting and other light work. [56-58.]

A vocational expert ("VE"), Ruth Baruch, then testified at the hearing by telephone. After reviewing Wojcik's past work as a teacher's aide, the ALJ presented the VE with the following hypothetical:

> If we assume a person of the same age, education and work experience, but assume a person who's limited to say light work, as that's defined in the Commissioner's Regulations, but there'd be no overhead work on the left side.
>
> The person should be able to change position from sitting to standing or vice versa for a few minutes at least every half hour. No walking more than about 20 yards at a single time. No more than frequent use of the hands for fine fingering or repetitive motion.
>
> Would there be any job such a person could do including the past relevant work or transferable skills?

[69–70.] At first, the VE answered that Wojcik could do the work of a teacher's aide, daycare provider, or nursery school attendant. [70.] The VE then realized that she assigned Wojcik a Specific Vocational Preparation ("SVP") level of 3, and that the jobs that she identified required a

3

higher SVP. The VE corrected herself and testified that Wojcik could be a babysitter, small parts assembler, final inspector,[1] table worker, or bonder. [71–74.] Under questioning from Wojcik's attorney, the VE testified that changing the hypothetical from frequent to occasional reaching would eliminate "the production type of jobs because they require at least frequent reaching." [77.]

The ALJ issued his decision on February 28, 2014. [12–19.] As a preliminary matter, the ALJ found that Wojcik was insured only through September 30, 2005, making that date her date last insured. The ALJ then proceeded to his substantive analysis. At Step One, the ALJ found that Wojcik met the insured status requirements until September 30, 2005. [14.] The ALJ found that Wojcik did not engage in substantial gainful activity from July 25, 2004 through September 30, 2005. [14–15.] At Step Two, the ALJ found that Wojcik had the severe impairments of injuries to her neck and arms as sustained during her alleged accident of July 25, 2004. [15.] The ALJ did not find a severe impairment for Wojcik's psoriasis. Apparently putting aside Wojcik's own testimony and focusing on objective information, "there is no indication as to when this condition started, how it affected her ability to function, how was it treated and what was the response to medications between the alleged onset date and the date last insured. The claimant's representative requested and was given time to procure and submit medical evidence in regards to the psoriasis. More than the allotted time went by and the evidence was never submitted for consideration." [15.] At Step Three, the ALJ seems to have checked Wojcik's symptoms against the entirety of "section 1.00 of the Appendix 1 that addresses the musculoskeletal system." [15.]

---

[1] A final inspector "[t]ests polarity connections of finished storage batteries and inspects final assembly for defects. It is an unskilled job." [76.]

The ALJ assessed as follows how Wojcik's symptoms did not fall under any of the musculoskeletal listings:

> The medical evidence of record does not establish the existence of disorders such as frankly herniated nucleus pulposus, advanced arthritis, stenosis or arachnoiditis resulting in compression of nerve root or spinal cord, severely restricted rom of the spine, neurological deficits such as loss of strength, atrophy, fasciculation or any other finding clearly resulting in inability to stay in any position for any period of time, claudication, chronic pain and weakness interfering with effective ambulation or use of upper extremities.   No surgery was performed or even recommended.

[15.] The ALJ also considered pain "to the extent that there exists a medically determinable impairment that can be expected to produce it." The ALJ determined that "the record does not establish the need for pain clinics, alternative methods of treatment as would be biofeedback, TENS, hydrotherapy, hypnosis and acupuncture, to name a few." [16.] At Step Four, the ALJ determined that Wojcik "had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except no overhead reaching on the left, needs to change positions briefly for one or two minutes every half hour, walking is limited to 20 yards at a stretch and less than frequent use of hands for fine manipulation." [16.] The ALJ reached this conclusion after assessing medical records including from Dr. David Fisher; Dr. Fisher's records, according to the ALJ, lack information about neck injuries and contain information that Wojcik rejected a cortisone injection for her arm and denied neck pain. [17.] The ALJ discounted both Wojcik's hearing testimony and records from Deborah and Dr. Andrew Matteliano; the ALJ decided that this information mostly concerned later years and did little if anything to address Wojcik's situation between July 25, 2004 and September 30, 2005. In fact, the ALJ went as far as to point out that

> It is rather disconcerting that only a few pages appear, here and there, from before the date last insured, and all this other evidence appears from recent years.  As the

5

accident happened in the street, it is assumed that insurance claims were filed, maybe even a court case, so it is quite strange that not enough evidence is available.

[17.] Ultimately, the ALJ concluded that Wojcik was not disabled within the meaning of the Social Security Act (the "Act").

Wojcik appealed the ALJ decision to the Commissioner's Appeals Council on March 14, 2014. [7.] The Appeals Council received and considered medical records from Dr. Mazin Dhafir ("Dhafir") pertaining to Wojcik's psoriasis. The Appeals Council upheld the ALJ's decision on May 19, 2015. [1–5.]

**B.     *Factual and Medical Background***

The administrative file for this case includes records from Dr. Fisher. [180–196.] A note from December 13, 2006 indicates that Wojcik had carpal tunnel syndrome. [180.] A note from November 27, 2006 indicated that Wojcik had central disc protrusion and bilateral foraminal stenosis at the C4–5 and C5–6 levels, with mild stenosis at the C6–7 level. [182.] A note from October 25, 2006 contained information about possible carpal tunnel syndrome in the left wrist and a need for an MRI of Wojcik's neck. [183.] Electrodiagnostic tests performed on September 15, 2006 found some abnormal results consistent with left ulnar and radial neuropathy. [187.] A note from September 1, 2006 indicated that Wojcik had some tenderness over her right lateral epicondyle. [190.] The records that Dr. Fisher had dated before September 30, 2005 reflect the surgical repair of Wojcik's left ankle on July 26, 2004; normal alignment of left arm and wrist bones but some tenderness as of August 6, 2004; a need for some physical therapy as of August 27, 2004; and some continued tenderness in Wojcik's right lateral epicondyle as of October 6 and November 19, 2004 and February 11, 2005.

The administrative file for this case also includes records from Deborah and Dr. Andrew Matteliano. [197–257.] The initial evaluation occurred on August 21, 2007; Dr. Matteliano performed the evaluation because of the accident on July 25, 2004. [238.] Among other findings, the evaluation yielded a 3+ reflex at both triceps[2] and a positive Hoffman's sign bilaterally.[3] [239.] The evaluation also yielded some mild loss of motor power for bilateral grips, no sensory loss, and a positive Tinel's sign.[4] [239.] From the review of Wojcik's 2006 MRI, Dr. Matteliano diagnosed C4–5 and C5–6 disc protrusions. [239.] With respect to range of motion, Dr. Matteliano found cervical rotation of 60° bilaterally and extension that "was short ½," which might mean a 50% reduction.[5] [239.] In the years that followed, Dr. Matteliano began all or nearly all of his notes with the phrase "status post fall" and continually described positive reflex signs, cervical turning pain, and medication such as Lortab to manage pain. An evaluation on August 10, 2012—which also was "status post fall"—did note "sensory loss as previously noted along the C6 distribution."

---

[2] A reflex of 3+ amid other normal reflexes can indicate a neurological abnormality but is not necessarily dispositive. *See, e.g., The Precise Neurological Exam*, https://informatics.med.nyu.edu/modules/pub/neurosurgery/reflexes.html (last visited Aug. 3, 2016).

[3] A "positive Hoffmann's reflex reflects presence of an upper motor neuron lesion from spinal cord compression." *See Hoffman's Sign*, http://www.wheelessonline.com/ortho/hoffmans_sign (last visited Aug. 3, 2016).

[4] A Tinel's sign is a perception of tingling or "pins and needles" that reflects an attempt by an injured nerve to regenerate. *See, e.g., Tinel's Sign Test*, https://nervesurgery.wustl.edu/ev/evaluation/provocativetesting/Pages/tinel.aspx (last visited Aug. 3, 2016).

[5] Normal cervical range of motion is generally regarded to include a bilateral rotation of 70° and an extension of 55°. *See Physical Exam of the Cervical Spine*, http://www.wheelessonline.com/ortho/physical_exam_of_the_cervical_spine (last visited Aug. 3, 2016).

[197.] The Mattelianos considered Wojcik to have a permanent partial disability based on the condition of her neck.

Finally, the administrative file for this case includes four pages of notes from Dr. Dhafir, Wojcik's dermatologist. [258–261.] These handwritten notes are difficult to read but seem to indicate that Wojcik in fact was diagnosed with psoriasis on her scalp, arms, and trunk. Wojcik apparently had no other lesions on her head, neck, trunk, or extremities. The notes contain information about various sprays, lotions, and shampoo that Wojcik would use to manage her symptoms. The notes are dated from 2007 and 2008.

### III.     DISCUSSION

#### A.      *Standard of Review Generally*

The only issue to be determined by this Court is whether the ALJ's decision that Wojcik was not under a disability is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir.1991). Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

For purposes of both Social Security Insurance and disability insurance benefits, a person is disabled when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §§ 423(d) (2)(A) & 1382c(a)(3)(B).

Wojcik bears the initial burden of showing that her impairment prevents her from returning to her previous type of employment. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the plaintiff could perform." *Id.*; *see also Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir.1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir.1980).

To determine whether any plaintiff is suffering from a disability, the ALJ must employ a five-step inquiry:

(1) whether the plaintiff is currently working;

(2) whether the plaintiff suffers from a severe impairment;

(3) whether the impairment is listed in Appendix 1 of the relevant regulations;

(4) whether the impairment prevents the plaintiff from continuing her past relevant work; and

(5) whether the impairment prevents the plaintiff from continuing her past relevant work; and whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; *Berry, supra*, 675 F.2d at 467. If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir.1992). However, the ALJ has an affirmative duty to develop the record. *Gold v. Secretary*, 463 F.2d 38, 43 (2d Cir.1972).

To determine whether an admitted impairment prevents a plaintiff from performing her past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental demands of the work she has done in the past. 20 C.F.R. §§ 404.1520(e) & 416.920(e). The ALJ must then determine the individual's ability to return to her past relevant work given her residual functional capacity. *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir.1994).

**B.** *Steps One and Two*

The first two steps of the five-step inquiry do not require much discussion. Both sides seem to agree that Wojcik has not engaged in substantial gainful activity from the alleged onset date of July 25, 2004 through her date last insured of September 30, 2005. As for the second step, the ALJ found injuries of the neck and arm, linked to the accident of July 25, 2004, that individually or together qualify as severe impairments under 20 C.F.R. § 404.1520(c). With respect to the condition of psoriasis, Wojcik has not pursued the issue in her briefing to the Court, and the four pages of medical notes in the administrative record that address the condition offer very little information anyway. Consequently, the Court finds that substantial evidence supports the ALJ's findings for the first two steps.

C.  *Step Three and Listing 1.04(A)*

Wojcik and the Commissioner begin to diverge at the third step. While conceding that her date last insured is September 30, 2005 and that most of her medical records were generated after that date, Wojcik argues that her treating physicians linked their post-2005 evaluations and treatments to the accident of July 25, 2004. For example, Wojcik cites the comment in nearly all of Dr. Matteliano's notes that his evaluations were occurring "status post fall." Wojcik also cites Social Security Ruling ("SSR") 83-20 to argue that the onset of her signs and symptoms occurred before September 30, 2005 and that subsequent evaluations and treatments thus can receive full consideration. The Commissioner responds that SSR 83-20 does not apply because the ALJ found Wojcik not disabled. Without the application of SSR 83-20, the Commissioner holds to the position that Wojcik's complaints and medical evidence were insufficient for the time between July 25, 2004 and September 30, 2005.

"A claimant bears the burden of proof to show that his or her impairments meet or medically equal a listing. To meet a listing, a claimant's medically determinable impairment must satisfy all of the specified criteria in the Listing. If a claimant's impairment manifests only some of those criteria, no matter how severely, the impairment does not qualify." *Corbett v. Comm'r*, No. 7:08-CV-1248, 2009 WL 5216954, at *9 (N.D.N.Y. Dec. 30, 2009) (citations omitted). The scope of Listing 1.04(A) is straightforward: "Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the

spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.04. To fall under Listing 1.04(A), patients must show the following physical manifestations:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

*Id.* "Thus, in order to satisfy this listing, Plaintiff must establish that (1) she has a disorder of the spine which compromises a nerve root or the spinal cord, and (2) that this disorder is manifested by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss *and*, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *McKinney v. Astrue*, No. 5:05-CV-0174 LEK/GHL, 2008 WL 312758, at *4 (N.D.N.Y. Feb. 1, 2008).

Putting aside for a moment the issue of onset date, which the Court will address below, the administrative record as a whole might contain substantial evidence of all of the physical manifestations needed under Listing 1.04(A). As of November 2006, an objective MRI showed that Wojcik had foraminal stenosis as well as cervical disc protrusions that impinged on her anterior spinal cord and anterior subarachnoid space. [242.] By August 2007, Wojcik had neck pain that required medication; positive reflexes suggestive of neurological lesions; mild motor loss; and reduced cervical range of motion. [238–39.] Cervical turning pain with cramping persisted in December 2007 and April 2008, prompting use of a cervical collar at one point. [234, 236.] In 2009 and 2010, cervical turning dropped to 50° and positive reflexes persisted, as did cervical pain.

[221, 228.] In short, the administrative record as a whole contains clinical findings from treating physicians that would appear to satisfy all of the criteria for Listing 1.04(A). *Cf. Torres v. Colvin*, No. 14-CV-479S, 2015 WL 4604000, at *4 (W.D.N.Y. July 30, 2015) (reciting clinical evidence that "appears to support Plaintiff's testimony" about Listing 1.04(A)). The ALJ appears to have overlooked these clinical findings because he did not assess the administrative record as a whole, choosing instead to examine the time when Wojcik was insured and then downplaying other evidence in *post-hoc* fashion. *Cf. Martinez v. Barnhart*, 262 F. Supp. 2d 40, 46 (W.D.N.Y. 2003) ("The ALJ was required to review those allegations [of symptoms and onset date], along with plaintiff's work history and the entire medical record, to derive at a reasoned disability onset date.").

With the Court having found a possible satisfaction of Listing 1.04(A) at some point, the critical next step will be to determine what to do about the issue of onset date. "In many claims, the onset date is critical; it may affect the period for which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits." Titles II & XVI: Onset of Disability, SSR 83-20, 1983 WL 31249, at *1 (Jan. 1, 1983). "The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death. Convincing rationale must be given for the date selected." *Id.* at *3. When evidence for an important period of time is weak or lacking, subsequent evidence can be considered as long as it helps with the time period under consideration. *See Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989); *accord Navan v. Astrue*,

303 F. App'x 18, 20 (2d Cir. 2008) (summary order). "Where a plaintiff's impairment continues and becomes more severe after the expiration of insured status, such exacerbation of a pre-existing injury cannot form the basis for determination of an earlier disability. While the existence of a pre-existing disability can be proven by a retrospective opinion, such an opinion must refer clearly to the relevant period of disability and not simply express an opinion as to the claimant's current status." *Vitale v. Apfel*, 49 F. Supp. 2d 137, 142 (E.D.N.Y. 1999) (citations omitted).

Here, assuming without deciding that Wojcik actually met Listing 1.04(A), substantial evidence in the administrative record would point to an onset date of late 2006 or later. The only medical records available between the date of the accident, July 25, 2004, and the date last insured of September 30, 2005, come from Dr. Fisher's files. Dr. Fisher's files during that time make mention of a left arm cast and tender wrists. [195.] The files mention continued tenderness and some pain through the rest of 2004. [191–94.] Some discussion of possible physical therapy occurred in the only note dated in 2005. [190.] Wojcik denied neck pain in September 2006, and any discussion of nerve conduction studies did not begin until about then. [189.] Only with the MRI of November 2006 [181–82] does the record start to show the objective clinical findings that would tend to satisfy Listing 1.04(A). Those objective clinical findings appear in some detail in Dr. Matteliano's file. While Dr. Matteliano notes in every report that Wojcik's status is "post fall," all of his reports describe contemporaneous clinical findings. Dr. Matteliano's reports offer no insight about Wojcik's condition between July 25, 2004 and September 30, 2005. As a result, the administrative record here would seem to support a disability under Listing 1.04(A) but for no earlier than about November 2006. While the ALJ should have assessed the administrative record

14

as a whole before concerning himself with a possible onset date, any errors that the ALJ committed under these circumstances are harmless. *See Berry*, 675 F.2d at 469 (affirming a denial of benefits where "we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence"); *Duvergel v. Apfel*, No. 99 CIV. 4614 (AJP), 2000 WL 328593, at *11 (S.D.N.Y. Mar. 29, 2000) (citing cases to show that factual errors that do not change the case outcome are harmless). Substantial evidence supports the ALJ's determination that Wojcik did not meet or equal a listing while she was insured, and no further assessment of this step on remand would change the outcome required by that determination.

### D. *Steps Four and Five*

"If a claimant has a severe impairment limiting her mental or physical ability to do basic work activities but not constituting a listed impairment in Appendix 1 of the Social Security regulations, the Commissioner asks, at Step Four, whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform her past work." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (internal quotation and editorial marks and citations omitted). The Commissioner has issued agency guidance for determining a claimant's residual functional capacity:

> At step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it.
>
> RFC may be expressed in terms of an exertional category, such as light, if it becomes necessary to assess whether an individual is able to do his or her past relevant work as it is generally performed in the national economy. However,

15

> without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work as it is generally performed in the national economy because particular occupations may not require all of the exertional and nonexertional demands necessary to do the full range of work at a given exertional level.
>
> At step 5 of the sequential evaluation process, RFC must be expressed in terms of, or related to, the exertional categories when the adjudicator determines whether there is other work the individual can do. However, in order for an individual to do a full range of work at a given exertional level, such as sedentary, the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level.

Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184, at *3 (July 2, 1996). Although function-by-function is preferred, it is not required. "The relevant inquiry is whether the ALJ applied the correct legal standards and whether the ALJ's determination is supported by substantial evidence. Where an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, we agree with our sister Circuits that remand is not necessary merely because an explicit function-by-function analysis was not performed. Remand may be appropriate, however, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Cichocki*, 729 F.3d at 177 (citations omitted).

Here, a remand would be helpful in cleaning up confusing testimony from the VE. The VE appeared at the hearing by telephone [29] and was frequently inaudible or "breaking up." [*See* 70–76 *passim*.] The original hypothetical that the ALJ posed to the VE did not make clear whether Wojcik's capacities were being assessed in the present time or in connection to the insured period between July 25, 2004 and September 30, 2005. The VE responded quickly that Wojcik could work certain teacher's aide jobs or as a nursery school attendant [70] but then had to backtrack to match available jobs to Wojcik's SVP [71]. The VE proceeded to describe other jobs that Wojcik could work but had to backtrack again in a confusing dialogue about frequency, fine fingering, repetitive motion, reaching, and handling. [74–77.] Wojcik's counsel then tried to clarify the testimony by starting the question, "So if somebody had problems with feeling in their hands–" [77], but the ALJ cut him off and said, "She's answered the question." [78.] Wojcik's counsel did have one last opportunity to ask, "So what if we, if we made it up to frequent but not including frequent?" [79.] The VE responded that "frequent" meant "up to 2/3rd of the time." [79.] None of the dialogue with the VE helps the Court understand what functions, jobs, SVPs, and timeframe the ALJ ultimately considered. *Cf. Lugo v. Chater*, 932 F. Supp. 497, 504 (S.D.N.Y. 1996) ("Proper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform. Neither occurred here. The exchange between the ALJ and the vocational expert was hopelessly muddled, forming an unacceptable basis for the ALJ's decision regarding [plaintiff's] disabilities and capacity for substantial employment."). While deciding that a remand is necessary for more exact assessment

from the VE, the Court takes no position on whether the ALJ's ultimate conclusions at Steps Four and Five should change. *Cf. Owens v. Astrue*, No. 506-CV-0736 NAM/GHL, 2009 WL 3698418, at *8 (N.D.N.Y. Nov. 3, 2009) ("Even assuming the RFC analysis was proper, the hypotheticals posed to the expert were vague and did not contain a complete description of plaintiff's functional limitations. The RFC findings contained in the decision must match the hypothetical posed to the expert.") (citations omitted).

## IV.   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Wojcik's motion (Dkt. No. 9) in part, to vacate the Commissioner's final determination and to require a repeated analysis of Steps Four and Five. The Court recommends denying Wojcik's motion in all other respects. The Court also recommends denying the Commissioner's motion (Dkt. No. 15).

## V.   OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

*/s/ Hugh B. Scott*
HONORABLE HUGH B SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: August 3, 2016